UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDIN ADGUSTO CHACON, | No. C 05-4880 SI (pr) |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER** |
| v. | |
| D. GALLIAN, sergeant; et al., | |
| Defendants. | |

Edin Adgusto Chacon filed this pro se civil rights action under 42 U.S.C. § 1983, alleging a claim for deliberate indifference to his medical needs and a state law claim for negligence. The parties did not demand a jury trial, and the action came on for trial before the court on December 16-17, 2008. The court heard testimony, received exhibits and heard argument at trial. The court now makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1.  At the relevant time, January 19-22, 2005, Edin Chacon was a prisoner housed in the C-facility of the security housing unit ("SHU") at Pelican Bay State Prison. The C-facility of the SHU had about 500 prisoners in it. The SHU had the most restrictive conditions in the California prison system; in general, a SHU prisoner would not be allowed out of his cell except when the prison staff opened the door to the cell to let the prisoner go to a specific destination (e.g., exercise yard, shower, or medical appointment). Within the SHU the housing units were set up as pods, with two tiers of cells in each pod. A prisoner cannot see into another cell when he is in his cell because the cells in each pod all face the same direction. Prisoners the C-facility can communicate with each other by speaking or yelling.

2. The medical facilities at Pelican Bay included a clinic in the SHU and an infirmary. (The parties referred to the latter facility interchangeably as the infirmary, the C.T.C., and the emergency room. For clarity's sake, the court will refer to it as the infirmary.)

3. In the SHU, medical technical assistants ("MTAs") distributed medicine to prisoners in the morning and evening. About 100 doses of medicine were distributed in the morning and about 75-100 doses were distributed in the evening to the C-facility during the relevant time. The procedure for distribution was that the MTA came to the pod door with a cart full of medicine, and the prisoners were let out of their cells one at a time to receive medicine at the pod door from the MTA.

4. While standing at the pod door, an MTA could not see Chacon in his cell.

5. For security purposes, an MTA was not supposed to enter the SHU pod unless accompanied by correctional officers.

6. All medicine (including both prescription and over-the-counter medications) had to be ordered by prison staff physicians, and those orders were sent to the prison pharmacy to be filled. The pharmacy issued the medicine and had it ready for the MTA to dispense to the prisoners. The pharmacy provided a chart identifying which prisoners were to be given medicine.

7. In the SHU, the normal procedure for a prisoner who returned from outpatient surgery was that the prisoner would be escorted by correctional staff to the infirmary, where his condition would be checked and any doctor's orders from the outside doctor would be re-ordered by a prison doctor. The reason for the re-ordering of an outside doctor's orders was that California correctional facilities had a policy that all medicine to be dispensed to a prisoner had to be pursuant to an order of a prison doctor.

8. Michelle Edwards was a registered nurse who worked as a floater at Pelican Bay, filling in for nursing employees who were absent or on vacation. On January 19, she was the temporary clinical nurse for the SHU in the C-facility. She had been in that position for about three weeks, although she had worked at the prison for about 9-10 months and had been a registered nurse for many years.

2

9    Chacon had rectal bleeding and eventually was diagnosed as having internal hemorrhoids. On January 19, he was sent from Pelican Bay to Sutter Coast Hospital, where Dr. Polidore performed a hemorrhoidectomy. Chacon was returned to Pelican Bay that same day by about 1:00 p.m. with discharge instructions.

10.   The "discharge instructions for going home" form he received from Sutter Coast Hospital listed two medicines for Chacon: a stool softener to be taken daily for two weeks and Motrin "600 mg. every 6 hrs. as needed x 7 days." On the portion of the form regarding "care of wound and dressing," there were no marks; on the portion of the form regarding "diet," the box marked "no restrictions" was checked and the patient was instructed to increase fluid intake as well as fruits and vegetables. The form also instructed the patient to "call if: unrelieved pain, fever >101, excessive bleeding." The form did not instruct that the patient was to be provided with gauze pads, but Dr. Polidore told Chacon that he would receive them because he would be passing blood via the rectum for about a week and was to use the gauze to clean the area.

11.   Upon his return to the prison from his outpatient surgery, Chacon was not processed in compliance with the normal procedure, i.e., he was not taken to the infirmary.

12.   Instead, Chacon was taken to the SHU clinic where he saw nurse Edwards. The correctional officer escorting Chacon gave Dr. Polidore's discharge orders for Chacon to nurse Edwards.

13.   On January 19, nurse Edwards did not know the normal procedure for processing prisoners returning to the SHU from outpatient surgery.

14.   Nurse Edwards checked on Chacon's health and released him to his cell. She told him he would receive the medicine and gauze pads at the evening medicine distribution in his pod.

15.   Nurse Edwards took the discharge orders to the office of Dr. David, the physician for the SHU clinic. She placed the discharge orders on Dr. David's desk where there was other paperwork, and stated that the prisoner had just returned from surgery and these were his orders. She did not further converse with Dr. David, but thought Dr. David acknowledged receipt of the documents. Nurse Edwards left work about an hour later at the end of her shift.

16. When nurse Edwards put the discharge orders on her desk, Dr. David was engaged in preparing progress notes and doctor's orders. That day, Dr. David did not re-order the medicine ordered by Dr. Polidore.

17. There was no evidence that, as of January 19, nurse Edwards had taken any steps to learn the normal procedure for processing prisoners returning to the SHU from outpatient surgery. There was no evidence that nurse Edwards asked Dr. David on January 19 if the discharge orders were supposed to be left on Dr. David's desk.

18. In March 2005, nurse Edwards learned of the normal procedure for processing prisoners returning from outpatient surgery.

19. Defendant Victor Gorospe, a licensed vocational nurse, worked as an MTA at Pelican Bay in January 2005. He did the evening medicine distribution in the SHU C-facility on January 19.

20. Frank Fernandez was a prisoner housed on the lower tier of the same pod where Chacon was housed on the upper tier. During January 2005, Fernandez was one of the many prisoners being let out of his cell and retrieving the medicine at the pod door.

21. On January 19, Chacon asked Fernandez to ask the MTA if the MTA had the medicine and gauze pads for Chacon when the MTA was handing out medicine that evening.

22. Fernandez asked MTA Gorospe during the evening medicine distribution on January 19 to check if Gorospe had medicine and gauze pads for Chacon that had been ordered in his discharge orders from outpatient surgery earlier that day.

23. Fernandez told MTA Gorospe that Chacon was starting to have pain and bleeding.

24. Chacon also yelled down to MTA Gorospe to inquire if Gorospe had the medicine that had been ordered in his discharge orders from outpatient surgery.

25. MTA Gorospe checked his chart and determined that he did not have any medicine for Chacon. He told Chacon and Fernandez that he did not have any medicine for Chacon, and that he would check into the matter.

26. MTA Gorospe did not have Chacon let out of his cell so MTA Gorospe could see him.

4

27. MTA Gorospe did not have any gauze pads on the medicine cart and told the prisoners that. He later obtained gauze pads and put them in the control booth so someone could get them. When Gorospe returned with the gauze pads, he did not speak to Chacon or Fernandez. These gauze pads did not reach Chacon.

28. After the medicine was distributed to the prisoners, Gorospe made further inquiry about Chacon's request for medicine. He called the infirmary and found that there were no orders for medicine for Chacon. He did not call the on-call doctor or ask a nurse at the infirmary for the medicine to be ordered that night.

29. MTA Gorospe wrote a health care services request form and left it in the clinic for the morning shift to address. The form had Chacon's name and cell number on it and stated "I/M suppose [sic] to have received pain meds from hemorrhoidectomy procedure on 1/20/05." Although the form was dated January 20, it was written by Gorospe on the night of January 19, 2005.

30. There was no evidence that the form was reviewed on January 20. The form has a note indicating it was not addressed until January 21 at the earliest: an unidentified author wrote on the form "was scheduled 1-24-05 & meds ordered 1-21-05."

31. Chacon did not receive Motrin, stool softener or gauze pads on January 19.

32. By the morning of January 20, Chacon's pain was worse, and he was unable to urinate or have a bowel movement.

33. Defendant Robert Munoz, a licensed vocational nurse, worked as an MTA at Pelican Bay in January 2005. He did the morning medicine distribution in the SHU C-facility on January 20.

34. During the morning medicine distribution on January 20, Chacon and Fernandez asked MTA Munoz if he had the medicine and gauze pads for Chacon who had returned from outpatient surgery with discharge orders for them. Fernandez also told Munoz that Chacon was sick.

35. MTA Munoz checked his chart, found that he had nothing listed for Chacon, told the prisoners that he had nothing listed for Chacon, and said he would check into the matter.

5

36. MTA Munoz did not give gauze pads to Chacon. He did not have them on the medicine cart.

37. MTA Munoz did not have Chacon released from his cell to view him and did not physically examine him.

38. On January 20, MTA Munoz did not see the health care request form Gorospe had prepared and left in the clinic the previous night.

39. During the evening medicine distribution on January 20 and the morning medicine distribution on January 21, non-defendant MTAs again had no medicine or gauze pads for Chacon, and promised to look into the matter. These MTAs had Chacon released from his cell and consulted with him.

40. Meanwhile, Chacon prepared an inmate grievance on January 21, in which he explained that he had returned from outpatient surgery on January 19, and had not received the pain killers, gauze and stool softeners. The inmate appeal also stated that Chacon had been in severe pain, especially when having a bowel movement, and had been bleeding.

41. Nurse Edwards responded to the inmate appeal the same day. In her response on January 21, Edwards wrote that the doctor would write the orders for Chacon's medicine and that Chacon was scheduled to be seen by a doctor early the next week.

42. Dr. David ordered the medicine on January 21.

43. Defendant Lloyd Goulter, a registered nurse, worked as an MTA at Pelican Bay in January 2005. He did the evening medicine distribution in the SHU C-facility on January 21.

44. MTA Goulter provided Motrin, stool softeners and gauze pads to Chacon during the evening medicine distribution on January 21.

45. Chacon told MTA Goulter he had feverish symptoms and pain, and had not received his medicine since his outpatient surgery on January 19.

46. MTA Goulter believed that the medicine he gave to Chacon would address Chacon's complaints, and knew that Chacon had not received his medicine before then. MTA Goulter did not call a doctor when Chacon reported his feverish symptoms and pain because he was bringing medicine to Chacon that he thought would address Chacon's complaints. MTA

Goulter thought a doctor would tell him to give the medicine a chance to work.

47.   During the evening and overnight, there were no doctors on site at the SHU. There was a doctor on call who could be contacted via a telephone. The doctors' shifts were from 8:00 a.m. - 4:00 p.m. There were nurses in the infirmary during the evening and overnight.

48.   None of the MTA defendants doubted Chacon was truthful in telling them that he had just had a hemorrhoidectomy outpatient surgery and that medicine and gauze pads had been ordered for him by the outside doctor.

49.   On January 22, Chacon received his medicine during the morning distribution of medicine by the MTA.

50.   Later on the morning of January 22, Chacon called out for help. He had been in severe pain and urinating blood, and was unable to have a bowel movement.

51.   A correctional officer brought Chacon by wheelchair to the clinic.

52.   At the clinic, MTA Munoz took Chacon's vital signs, and notified the infirmary that Chacon needed to go there.   Chacon's temperature was recorded as 99.8 degrees.

53.   Chacon was rushed to the infirmary. At the infirmary, Chacon was given pain medication, examined by a doctor, and treated for a urinary tract infection that had traveled to his kidneys. Chacon was in the infirmary for two days before being returned to his SHU cell.

54.   Kenneth Hammerman, M.D., a gastroenterologist, testified as an expert witness for the defense after reviewing the medical records for Chacon. Dr. Hammerman opined that Chacon's infection was a consequence of the surgical procedure and that the failure to administer Motrin, stool softener, and gauze pads did not cause the infection. Dr. Hammerman opined that the infection was not due to stool blocking or being impacted in the rectum because a rectal exam on January 22 noted no stool in the rectum and noted no bleeding. The absence of stool softener did not matter with respect to the urinary tract infection because Chacon did not have stool in his rectum, and only stool located in the rectum (which is adjacent to the bladder and may push on it) would have mattered for purposes of determining the cause of the urinary tract infection. Dr. Hammerman explained that a hemorrhoidectomy surgery can traumatize the bladder due to the proximity of rectum and bladder, and the patient may have urinary retention

7

as a result. The urinary retention creates the urinary tract infection risk, and the infection can travel upstream in the urinary tract, e.g., to the kidneys. The problem was the blocked urine, and it was not a matter of fecal matter getting into the urinary tract. Dr. Hammerman also explained that, although Motrin is an anti-inflammatory agent and might have caused Chacon to have less inflammation, Chacon still would not have been able to urinate; therefore, one cannot say with certainty that he would not have developed a urinary tract infection if he had been given Motrin. The court finds Dr. Hammerman's testimony to be credible.

55. The kidney/urinary tract infection Chacon developed was not caused by the failure to provide him with Motrin, stool softener, or gauze pads.

56. Chacon was in more pain without the Motrin and stool softener than he would have been if he had received the Motrin and stool softener mentioned in Dr. Polidore's discharge instructions. Chacon was in more discomfort without the gauze pads than he would have been in if he had been provided with the gauze pads as directed by Dr. Polidore.

## CONCLUSIONS OF LAW

1. The court has federal question jurisdiction to decide this action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331. The court has supplemental jurisdiction over the state law negligence claim. See 28 U.S.C. § 1367.

2. Venue is proper because the events giving rise to Chacon's claims occurred in Del Norte County, which is within the Northern District of California. 28 U.S.C. §§ 84(a), 1391(b).

3. To prevail on a claim under 42 U.S.C. § 1983, Chacon must show (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the violation was committed by a person acting under the color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988).

4. All defendants were acting under color of state law as they interacted with Chacon.

5. Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 102-04 (1975). To prove that the response of prison officials to a prisoner's medical

need was constitutionally deficient, the prisoner must establish (1) a serious medical need and (2) deliberate indifference to that need by prison officials. See McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

6.  "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Id. at 1059 (quoting Estelle, 429 U.S. at 104). A prison official exhibits deliberate indifference when he or she knows of and disregards a substantial risk of serious harm to prisoner health by failing to take reasonable measures to abate it. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he or she must actually draw that inference. Id.

7.  Chacon's post-surgery need for Motrin, stool softener and gauze pads was a serious medical need.

8.  None of the defendants acted with deliberate indifference to Chacon's serious medical need. Each defendant took some positive steps to attempt address Chacon's request for Motrin, stool softener and gauze pads.

9.  "'[N]egligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm.' . . Thus, as a general proposition one 'is required to exercise the care that a person of ordinary prudence would exercise under the circumstances.' . . . Because application of this principle is inherently situational, the amount of care deemed reasonable in any particular case will vary, while at the same time the standard of conduct itself remains constant, i.e., due care commensurate with the risk posed by the conduct taking into consideration all relevant circumstances." Flowers v. Torrance Mem. Hosp. Med. Center, 8 Cal. 4th 992, 997 (Cal. 1994) (citations omitted). Professionals, by virtue of their training and education in their professions, do not have a higher duty of care, but instead their training and education are circumstances relevant to the overall assessment of what constitutes ordinary prudence in the situation they confront. See id. at 997-98.

10. In a medical malpractice case in California, expert testimony is necessary to

9

provide the standard of care for a practitioner of the kind of medicine at issue. See Flowers, 8 Cal. 4th at 1001. However, expert testimony is not necessary when the conduct required by the particular circumstances is within the common knowledge of lay persons. Id.

11. The court rejects defendants' argument that plaintiff's negligence claim must fail because he offered no expert testimony to establish the standard of care for medical care providers. The medical care issue here was the provision of medicine and gauze pads that had been ordered by the treating surgeon. The way Pelican Bay staff members implemented those orders had far more to do with prison policies than medical care standards. An expert nurse or doctor would have been unable to offer a relevant opinion in this case because the issue was not a matter of medical judgment but instead a matter of prison operations. If one stripped away the prison setting, the question here would be whether nurses and technicians were free to ignore a doctor's discharge orders – a question as to which the common-sense answer is "no." No expert testimony was required on that point as it was within the common experience of lay persons. See generally Miller v. Los Angeles County Flood Control Dist., 8 Cal. 3d 689, 702 (Cal. 1973). Rather than being a question of professional judgment in the provision of medical care, this case is much more about the behavior of employees in large organizations with a division of labor. An expert is not needed to determine whether there is negligence in such an employee's response when a customer needs service and is wholly dependent on workers in the organization for services – whether it be an office worker stuck in an elevator trying to get someone to get him out, or a bank customer trying to get a bank to fix its bookkeeping error, or a prisoner trying to get his outside medical orders recognized and implemented by prison staff. The steps a reasonable front-line worker should take to resolve a situation where a customer alerts the worker to the fact that something is amiss – that the elevator is stuck, that the bank balance is wrong, or that the medical orders have not been implemented – do not require expert testimony. As to the nurse's mistake, learning office procedures and following them is not a matter of professional medical judgment and is not beyond the ken of laypersons.

12. Michelle Edwards was negligent in her handling of Chacon's discharge orders on his return from outpatient surgery. She was negligent in failing to inform herself of the normal

procedure for processing a prisoner returning from outpatient surgery and in not checking with Dr. David to be sure the discharge orders were re-ordered by Dr. David. Where, as at Pelican Bay, there is a division of labor in the organization, a prudent person would inform herself of the standard operating procedures and comply with them, or would make inquiry to determine whether her selected course of action (leaving orders in someone's in-box) would result in the desired outcome (having those orders entered into the prison medical care system). Her negligence caused the pain, suffering and discomfort that Chacon experienced the next couple of days due to not receiving the Motrin, stool softener, and gauze pads in a timely manner.

13. Michelle Edwards was not negligent in her response to Chacon's inmate appeal.

14. Victor Gorospe was negligent in his response to Chacon's request for medicine and supplies. Although Gorospe made a call to inquire after the medicine and left a note for the next shift to check into the matter, Gorospe was negligent in not taking further steps to find out what had become of the discharge orders which he did not doubt existed but which he could not find in the Pelican Bay system. Gorospe also was negligent in not having Chacon let out of his cell to visually evaluate him in light of the information that Chacon and Fernandez provided about Chacon's condition and need for medicine. Gorospe also was negligent in not ensuring that the gauze pads that he did retrieve were delivered to the patient rather than left in the control booth. His negligence caused the pain, suffering and discomfort that Chacon experienced the next couple of days due to not receiving the Motrin, stool softener, and gauze pads in a timely manner.

15. Robert Munoz was negligent in his response to Chacon's request for medicine and supplies on January 20. Munoz was negligent in not having Chacon let out of his cell to visually evaluate him in light of the information that Chacon and Fernandez provided about Chacon's condition and need for medicine. Munoz was negligent in not making further inquiries to determine why Chacon's discharge orders had not made it into Pelican Bay's medical information system or calling a doctor to have those orders written. His negligence caused the pain, suffering and discomfort that Chacon experienced that and the next day due to not receiving the Motrin, stool softener, and gauze pads.

16. Munoz was not negligent in his response to Chacon's situation on January 22, when he evaluated him at the clinic and sent him to the infirmary.

17. Lloyd Goulter was not negligent in his activities with respect to Chacon on January 21. Goulter provided Chacon with the ordered medicine and reasonably determined not to call a doctor.

18. As the foregoing paragraphs show, the court rejects the defendants' arguments that they did all they could do or did all that they should have done as reasonable persons.

## DECISION

Having made the above findings of fact and conclusions of law, the court now awards plaintiff $1,000.00 (one thousand dollars) total in compensatory damages on the negligence claim. Defendants Edwards, Gorospe, and Munoz are jointly and severally liable for this award. The court finds in favor of defendant Goulter on the negligence claim. The court finds in favor of defendants Edwards, Gorospe, Munoz, and Goulter on the Eighth Amendment claim.

## ORDER

The court has found in plaintiff's favor and against defendants Edwards, Gorospe and Munoz, and has awarded plaintiff a total of $1,000.00 in compensatory damages.

Judgment will be entered (1) in plaintiff's favor and against defendants Edwards, Gorospe, and Munoz, (2) in Goulter's favor against plaintiff, and (3) dismissing all other defendants. The clerk shall close the file.

IT IS SO ORDERED.

Dated: December 22, 2008

SUSAN ILLSTON
United States District Judge